**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MINNESOTA LAWYERS MUTUAL INSURANCE COMPANY**<br>**333 S. 7th Street**<br>**Minneapolis, MN 55402,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**McCABE, WEISBERG & CONWAY LLC f/k/a McCABE WEISBERG & CONWAY, P.C.**<br>**123 South Broad Street**<br>**Suite 1400**<br>**Philadelphia, PA 19109,**<br><br>**Defendant** | : | **CIVIL ACTION**<br><br>**NO.** |

**COMPLAINT**

**DECLARATORY JUDGMENT**

Plaintiff Minnesota Lawyers Mutual Insurance Company brings this Declaratory Judgment Action pursuant to 28 U.S.C. § 2201 and states as follows:

**THE PARTIES**

1. Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM") is an insurance company with its principal place of business at 333 S. 7th Street, Minneapolis, Minnesota 55402.

2. Defendant McCabe, Weisberg & Conway LLC f/k/a McCabe, Weisberg & Conway P.C. ("MWC") is a Pennsylvania limited liability company with a business address of 123 South Broad Street, Suite 1400, Philadelphia, Pennsylvania 19109.

## JURISDICTION AND VENUE

3. This Court may properly exercise jurisdiction over the parties and subject matter of this lawsuit pursuant to 28 U.S.C. § 1332 as, for purposes of diversity jurisdiction the amount at issue in the underlying suit is in excess of $75,000, MLM is a Minnesota citizen and, upon information and belief, no member of MWC is a citizen of Minnesota and thus there is diversity of citizenship.

4. Venue is proper in this Judicial District under 28 U.S.C. § 1391 as the policy of insurance that is the subject of this action was issued to MWC in this judicial district, and MWC is subject to the court's personal jurisdiction with respect to the civil action in question.

## FACTUAL BACKGROUND

5. MLM issued a Lawyers Professional Liability Insurance Claims Made Policy to MWC, with a policy period of April 14, 2013 to April 14, 2014, among other policies, a true and correct copy of which is attached hereto as Exhibit "A" (the "Policy").

6. MWC was served with a United States Attorney's Office Investigation: Litigation Hold Notice (the "DOJ Hold Letter"), dated June 21, 2013, stating that the United States Attorneys' Office for the Southern District of New York is investigating the Firm pursuant to the False Claims Act, 31 U.S.C. § 3729, et. seq. (the "FCA") and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a ("FIRREA").

7. MWC forwarded a copy of that letter to MLM, seeking the appointment of counsel in responding to the DOJ Hold Letter.

8. The DOJ Hold Letter stated that it is written in "anticipation of litigation," and that "the Government will soon issue a Civil Investigative Demand pursuant to 31 U.S.C. § 3733, and/or a FIRREA Subpoena, pursuant to 12 U.S.C. § 1833a(g)…."

9. The DOJ Hold Letter further demanded that a litigation hold be put in place for Electronically Stored Information ("ESI") and other documents, pursuant to the Federal Rules of Civil Procedure.

10. The DOJ Hold Letter further stated that: "This investigation concerns [MWC's] charges for foreclosure-related services incurred on behalf of mortgage loan servicers, in connection with programs of the Federal Housing Administration of the United States Department of Housing and Urban Development ["FHA"], The Federal National Mortgage Association [("Fannie Mae")], and the Federal Home Loan Mortgage Corporation [("Freddie Mac")]…."

11. MLM issued a reservation of rights letter to MWC on August 13, 2013 in connection with the DOJ Hold Letter. A copy of that reservation of rights letter is attached hereto as Exhibit "B".

12. On or about November 22, 2013, the Department of Justice issued a subpoena on MWC in connection with its investigation concerning whether MWC "and/or others working in conjunction with [MWC], engaged in mortgage foreclosure fraud."

13. Upon information and belief, on or about September 24, 2012, a *qui tam* action had been initiated in the United States District Court for the Southern District of New York, by Peter D. Grubea ("Grubea") as relator.

14. Until March 27, 2018, that matter was under seal, and only was ordered unsealed because of the intervention of the United States in the matter, which is now captioned, United States of America ex Rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, et al., U.S. District Court for the Southern District of New York, CASE #: 1:12-cv-07199-JSR (the "*Qui Tam* Action").

15. Subsequently, on April 3, 2018, Grubea filed a Third Amended Complaint (the "*Qui Tam* Complaint" or the "Complaint") in the *Qui Tam* Action, a copy of which is attached hereto as Exhibit "C".

16. MLM only learned of the *Qui Tam* Action after the filing of the Third Amended Complaint, and is providing a defense to MWC in the *Qui Tam* Action, subject to a further reservation of rights letter, which was issued on May 7, 2018.

**ALLEGATIONS IN THE *QUI TAM* COMPLAINT**

17. As set forth more fully below, the Complaint seeks relief against MWC under four different sections of the federal False Claims Act (the "FCA"). See Exhibit "C".

18. Without accepting the truthfulness or merits of the allegations in the *Qui Tam* Complaint, or the merits of its claims, Grubea makes the following allegations concerning MWC.

19. The Complaint is made against a number of banks, law firms, and vendors providing service of process, publication, and title search services. See Exhibit "C".

20. The first sentence in the Complaint states: "This is a case about banks and law firms ***fleecing*** the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Federal Housing Administration ("FHA") of the United States Department of Housing and Urban Development ("HUD")." See Exhibit "C", Complaint at ¶1 (emphasis added).

21. Freddie Mac and Fannie Mae are collectively referred to as government-sponsored enterprises ("GSEs") throughout the Complaint. See Exhibit "C".

22. In the Complaint, MWC is either referred to as the McCabe Firm or among the Law Firm Defendants. See Exhibit "C".

23. The Complaint alleges that "[i]n the wake of the 2008 housing crisis, defendants overcharged the GSEs and FHA by hundreds of millions of dollars for the rapidly proliferating services needed to file thousands of residential foreclosure actions." See Exhibit "C", Complaint at ¶1.

24. The Complaint "seeks to recover damages and penalties from the Law Firm Defendants for causing banks to make claims for excessive reimbursements." See Exhibit "C", Complaint at ¶2.

25. The Complaint alleges that: "This action seeks to recover damages and penalties on behalf of the Government for the illegal and excessive claims made by the Bank Defendants for reimbursement from Fannie Mae and Freddie Mac (collectively, "the GSEs") and FHA. This suit also seeks to recover damages and penalties from the Law Firm Defendants for causing banks to make claims for excessive reimbursements. This suit further seeks damages and penalties against the Bank Defendants for wrongfully keeping overpayments, years after the Bank Defendants realized that they had received those overpayments." See Exhibit "C", Complaint at ¶3.

26. The Complaint alleges that "the GSEs engage financial institutions to service mortgages by collecting payments from borrowers, by applying payments, by pursuing collections from delinquent borrowers, and by pursuing foreclosures on delinquent mortgages. The GSEs contract with financial institutions, called 'servicers,' to perform these functions, and the GSEs reimburse servicers for certain expenses." See Exhibit "C", Complaint at ¶4.

27. The FHA also relies on servicers, and "in the event that a borrower defaults on an FHA-insured mortgage, the servicer is able to submit a claim to FHA for the costs associated with the defaulted mortgage." See Exhibit "C", Complaint at ¶5.

28. The Complaint alleges that mortgage servicing includes pursuit of foreclosure proceedings. "To pursue foreclosures, servicers typically engage law firms. Both the GSEs and

FHA typically pay attorneys a flat fee to handle foreclosures. But the GSEs and FHA also reimburse servicers for other expenses incurred in the foreclosure process. These foreclosure-related expenses, also called default-related legal expenses, typically include title searches (*e.g.*, to identify necessary parties), service of process (*e.g.*, to commence foreclosure proceedings with a summons and complaint), and publication and posting costs. The GSEs and FHA limit servicers' rights to reimbursement to those foreclosure expenses that are necessarily incurred and reasonably priced in the area." See Exhibit "C", Complaint at ¶6.

29. "Moreover, Fannie Mae's contracts with servicers has contained a best value clause, and Freddie Mac and FHA have required servicers to conduct ongoing quality control. The Fannie Mae contract provides that both servicers and the law firms employed by servicers 'must make every effort to reduce default-related legal expenses,' including expenses billed by title-search, service-of-process, and publication vendors." See Exhibit "C", Complaint at ¶7.

30. The Complaint alleges that the banks failed to keep fees reasonable and instead submitted claims for excessive reimbursements for unreasonable and unnecessary foreclosure expenses. Complaint at 8-9. The Complaint describes the Bank Defendants in this matter as having "opened the door to ***rampant profiteering by foreclosure expense vendors***. This profiteering became widespread throughout the United States in the wake of the housing crisis. Vendors, ***as well as many foreclosure law firms, took advantage of the Bank Defendants' lack of oversight***." See Exhibit "C", Complaint at ¶9 (emphasis added).

31. The Complaint alleges that: "Law firms, such as the Law Firm Defendants, faced rate pressures and caps on their attorneys' fees. They created subsidiary or affiliated corporations ("affiliates") to generate additional profits by handling and billing for title searches, service of process, publishing notice, and related services. These affiliates generated bills for ***unnecessary***

***services and charged excessive rates***, which the law firms passed along to their clients, including the Bank Defendants. Such affiliates—as well as other, non-affiliated vendors—profited by providing services at excessive rates and services that were unnecessary and ***performed solely to generate fees***. …. The Rosicki Defendants and the McCabe Defendants and others thus found opportunities to bill foreclosure expenses at supra-market prices." See Exhibit "C", Complaint at ¶10 (emphasis added).

32. The Complaint describes the foregoing as a "scheme" and states: "This ***scheme*** cost the GSEs and FHA hundreds of millions of dollars. The Bank Defendants, upon information and belief, failed to limit reimbursement requests to necessary and reasonably priced items and made no effort to reduce foreclosure expenses or conduct quality control over such expenses. As a result, law firms, like … the McCabe Firm, were able to create business models to profit at the expense of the GSEs and FHA. Law firms and their affiliated vendors generated unnecessary and unreasonably priced fees, which they ***knew would be passed onto the GSEs and FHA***." See Exhibit "C", Complaint at ¶11 (emphasis added).

33. The Complaint goes on: "When the Bank Defendants received these inflated invoices, they turned them over to the GSEs and FHA, ensuring that the Bank Defendants would not be left holding the bag for overpriced vendor services, while simultaneously saving the Bank Defendants from spending resources on compliance, quality control, and efforts to negotiate better prices. All the while, vendors, like the Law Firm Defendants' affiliates, profited handsomely." See Exhibit "C", Complaint at ¶11.

34. "Fannie Mae contracts with servicers, including the Bank Defendants, to service mortgages held or securitized by Fannie Mae. In the event that a servicer incurs certain foreclosure

fees in servicing a Fannie Mae mortgage, the servicer is able to submit a claim to Fannie Mae for reimbursement of those costs." See Exhibit "C", Complaint at ¶56.

35. "Fannie Mae's contract requires servicers to retain competent, diligent, and local legal counsel who are highly experienced in conducting foreclosures. Under the contract, the servicer is responsible for monitoring all aspects of the performance of its foreclosure attorneys." Complaint at 61. To meet their obligations, servicers "'must attempt to minimize the costs incurred from vendors utilized by law firms—such as auctioneers, process servers, title companies, posting companies, and newspapers or other publications—by ensuring that all costs are actual, reasonable, and necessary.' .... 'The servicer and law firm must regularly examine the pricing offered by alternative vendors and negotiate for the best value from the vendor and other qualified service providers.'" See Exhibit "C", Complaint at ¶62.

36. Scrutiny is heightened in circumstances where the attorneys used in the foreclosure process have an interest in other companies used in that process, referred to as affiliated business entities. See Exhibit "C", Complaint at ¶63.

37. Fannie Mae will only reimburse costs that are actual, reasonable and necessary. See Exhibit "C", Complaint at ¶64.

38. Fannie Mae's contracts prohibit reimbursement for costs that are unreasonable and unnecessary. See Exhibit "C", Complaint at ¶¶65-66.

39. "Moreover, the Fannie Mae contract requires servicers and foreclosure attorneys to minimize the costs incurred from third-party vendors by regularly examining the pricing offered by alternative vendors and negotiating for the best value from the vendor and other service providers." See Exhibit "C", Complaint at ¶67.

40. Further, "Fannie Mae has contemplated that law firms with vendor affiliates may attempt to wrongfully recover inflated fees. As a result, Fannie Mae has issued contract terms reiterating that any fees from law firm affiliates are limited to 'customary and reasonable fees for comparable services in the[] jurisdiction." See Exhibit "C", Complaint at ¶68.

41. Similarly, "Freddie Mac contracts with servicers, including the Bank Defendants, to service mortgages held or securitized by Freddie Mac. In the event that a servicer incurs foreclosure fees in servicing a Freddie Mac mortgage, the servicer is able to submit a claim to Freddie Mac for reimbursement of those costs." See Exhibit "C", Complaint at ¶83.

42. "Freddie Mac likewise requires that servicers ensure that any law firms they retain are free of any 'conflict of interest or potential conflict of interest.'" See Exhibit "C", Complaint at ¶92.

43. Its "rules state that the servicer 'must require the firm to disclose the identity of, and relationship with any entities the firm relies upon to provide third-party support functions performed on the Servicer's behalf, including, but not limited to, title searches, title insurance, posting, publication, and process services.' .... Freddie Mac also requires that servicers 'require the firm to disclose whether the firm has a process to select and regularly review costs and performance of vendors of related sources to ensure competitive pricing and high quality.'" See Exhibit "C", Complaint at ¶92.

44. Like Fannie Mae, "Freddie Mac's contracts permit reimbursement of only those costs that are actual, reasonable, and necessary." This includes attorney's fees and costs which must be customary and reasonable in the region at issue. See Exhibit "C", Complaint at ¶94.

45. FHA servicers are governed by certain HUD requirements. This includes, among others, a "mandatory HUD quality control requirement ... that servicers take steps to ensure that

unallowable foreclosure processing fees are not included in insurance claims. Specifically, HUD rules provide that servicers must review all aspects of their operations to ensure that all FHA requirements are met, including FHA rules regarding reimbursement for foreclosure processing fees and charges." See Exhibit "C", Complaint at ¶105.

46. "HUD rules further provide that servicers must implement, as a mandatory component of quality control, sufficient controls to ensure that claims for insurance benefits are properly prepared, calculated, supported, and submitted, including claims for foreclosure costs and fees." See Exhibit "C", Complaint at ¶105.

47. In seeking insurance benefits, among other things, HUD will reimburse servicers for "[f]ees and costs that are necessarily incurred and are reasonable and customary in the area." See Exhibit "C", Complaint at ¶109.

48. FHA will not reimburse for fees that are not reasonable or necessary, or for certain overhead items. See Exhibit "C", Complaint at ¶110.

49. "HUD rules expressly prohibit banks from listing any unallowable costs on their application for insurance benefits as either attorneys' fees or foreclosure-related costs." See Exhibit "C", Complaint at ¶111.

50. After establishing the GSE and FHA functions and obligations, the Complaint goes into Section III, "DEFENDANTS' SCHEMES". The Complaint alleges that "Defendants ***participated in a scheme*** that overcharged the GSEs and FHA for foreclosure services, such as performing title searches and serving process on foreclosure defendants." See Exhibit "C", Complaint at ¶113 (emphasis added).

51. The Complaint alleges that "law firms, such as the Law Firm Defendants, created subsidiary corporations to handle and bill for title searches, service of process, the arrangement of

publication of legal notices, and related services. Under that business model, such affiliated subsidiaries … generated ***illegal and excessive charges*** for foreclosure services, which the law firms passed along to their clients, including the Bank Defendants. The law firms, including the Law Firm Defendants, ***were aware of*** the Fannie Mae, Freddie Mac, and FHA rules limiting fees to necessary and reasonable costs, but overbilled regardless." See Exhibit "C", Complaint at ¶114 (emphasis added).

52. "This business model generated substantial profits for foreclosure services vendors (and the law firms that often owned them) because the Bank Defendants paid for unnecessary fees (*e.g.*, for unnecessary personal service) and because the Bank Defendants paid excessive fees, well above available market rates." See Exhibit "C", Complaint at ¶115.

53. The Complaint alleges that: "This business model was an important source of revenue for … the McCabe Firm, and other foreclosure law firms because Fannie Mae, Freddie Mac, and FHA effectively monitored, capped, and limited reimbursements for attorneys' fees—but not costs. Upon information and belief, that focus on attorneys' fees led foreclosure law firms, like the Rosicki and McCabe Firms, ***to find other ways to profit*** from foreclosure matters. The business model described allowed the Law Firm Defendants to profit from foreclosure work, despite the limitations on attorneys' fees." See Exhibit "C", Complaint at ¶116 (emphasis added).

54. The Complaint alleges: "Upon information and belief, as a result of their wrongful conduct, the Bank Defendants obtained millions of dollars of reimbursements from the GSEs and FHA, including reimbursements for illegal and excessive foreclosure fees relating to foreclosures across the United States." See Exhibit "C", Complaint at ¶121.

55. The Complaint alleges that the "McCabe Firm and/or its principals or agents have an interest in and control over [Defendants Attorney Outsourcing Support Services, Inc.] AOSS and [REO America Abstract, Inc.] REO. The Chairman or Chief Executive Officer of AOSS is

Terrence McCabe, a principle and named partner of the McCabe Firm, and AOSS shares office space with the McCabe Firm. REO's officers are all, upon information and belief, spouses of partners of the McCabe Firm: President Elizabeth McCabe is, upon information and belief, the spouse of partner Terrence McCabe; Secretary Judy Conway is, upon information and belief, the spouse of partner Edward D. Conway; Treasurer Anthony Gairo is, upon information and belief, the spouse of partner Margaret Gairo; and Vice President Janet Weisberg is, upon information and belief, the spouse of partner Marc Weisberg. REO shares office space with the McCabe Firm." See Exhibit "C", Complaint at ¶139.

56. The Complaint alleges that: "The McCabe Firm has contracted with AOSS and REO for the McCabe Firm's title and service work for foreclosure proceedings." See Exhibit "C", Complaint at ¶140.

57. It further alleges that: "Upon information and belief, AOSS and REO has systematically billed the clients of the McCabe Firm—and, ultimately, Fannie, Freddie, and FHA—at excessive rates for services including: a. Title searches well above market rates (*e.g.*, at more than $450, despite market rates between $100-$250); and b. Personal service well above market rates (*e.g.*, at more than $200, despite market rates of approximately $20-$40)." See Exhibit "C", Complaint at ¶141.

58. The Complaint further alleges that: "Upon information and belief, the McCabe Firm contracts for services at excessive rates from AOSS and REO ***for the primary purpose of generating fees for AOSS and REO***." See Exhibit "C", Complaint at ¶142 (emphasis added).

59. The Complaint further alleges that: "The McCabe Firm also contracts for these services to avoid performing the work that it is required to perform under the applicable GSE contracts and FHA rules in order to earn the legal fees that it charges to the Bank Defendants.

Upon information and belief, the McCabe Firm does not decrease its legal fees in cases where its affiliates handle the work required of the McCabe Firm. Accordingly, by offloading the tasks required of the McCabe Firm onto its affiliates, the McCabe Firm generates profits in two ways: (1) by generating fees for its affiliates; and (2) by avoiding labor and other overhead expenses that are supposed to be included in the McCabe Firm's legal fees." See Exhibit "C", Complaint at ¶143.

60. The Complaint alleges that "[t]hese services are not reimbursable by the GSEs or FHA." See Exhibit "C", Complaint at ¶143.

61. The Complaint further alleges that "AOSS does not provide many of these services itself. Instead, ***with the assent of the McCabe Firm***, AOSS often contracts with other entities to conduct services, such as service of process, and then ***simply marks up the bill before seeking reimbursement***. Although the McCabe Firm could readily contract directly with entities serving process, ***it chooses to contract with AOSS instead, in order to generate profits from allowing AOSS to mark up the services bills of other entities***. See Exhibit "C", Complaint at ¶144 (emphasis added).

62. The Complaint alleges that: "Upon information and belief, the McCabe Defendants billed the Bank Defendants for these unnecessary and excessive charges ***with the intention, expectation, knowledge, and belief*** that the Bank Defendants would seek reimbursement from the Government for these charges. See Exhibit "C", Complaint at ¶146.

63. The Complaint further states: "Upon information and belief, the conduct of the McCabe Defendants described above caused the Government, through FHA, Fannie Mae, and Freddie Mac, ***to pay false and fraudulent claims***." See Exhibit "C", Complaint at ¶147.

64. The Complaint alleges that: "The Bank Defendants' nationwide failures related to foreclosure expenses generated by law firms and vendors across the country. For instance, upon information and belief, in New York, law firms without affiliates regularly billed the Bank Defendants

for illegal and excessive costs, which the Bank Defendants included in claims for reimbursement from the GSEs and FHA." See Exhibit "C", Complaint at ¶167.

65. The Complaint includes numerous examples of how the alleged scheme functioned. Only a few involve the McCabe Firm. These include:

**a. The Katsura Court Property.**

302. Freddie Mac held a mortgage on a property on Katsura Court in Penfield, New York (the "Katsura Court Property"). Freddie Mac contracted with Flagstar to service the Katsura Court Property.

303. Under contract with Freddie Mac, Flagstar engaged the McCabe Firm to handle foreclosure proceedings as to the Katsura Court Property.

304. Upon information and belief, the McCabe Firm contracted with its affiliate service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

305. Upon information and belief, AOSS invoiced the McCabe Firm for service on defendants at the Katsura Court Property at an amount above market rates, which were between $20-$40 per person. Upon information and belief, AOSS hired another process service company to serve each person at market rates and simply marked up those invoices.

306. Upon information and belief, the McCabe Firm also contracted with its affiliate title vendor, REO, to bill for title searches relating to the foreclosure defendants.

307. Upon information and belief, REO charged approximately $450 for title work on the Katsura Court Property. This amount was well above market rates, which were between $100-$250.

308. Upon information and belief, the McCabe Firm submitted these invoices, with unreasonable and unnecessary foreclosure fees, to Flagstar.

309. Upon information and belief, Flagstar undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after June 2014, Flagstar overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

310. Upon information and belief, Freddie Mac paid Flagstar's reimbursement claim for foreclosure fees including the unreasonable and therefore unallowable amounts.

**b. The Columbia Street Property**

325. Freddie Mac held a mortgage on a property on Columbia Street in Hamburg, New York (the "Columbia Street Property"). Freddie Mac contracted with PNC to service the Columbia Street Property.

326. Under contract with Freddie Mac, PNC engaged the McCabe Firm to handle foreclosure proceedings as to the Columbia Street Property.

327. Upon information and belief, the McCabe Firm contracted with its affiliate service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

328. Upon information and belief, AOSS invoiced the McCabe Firm for service on defendants at the Katsura Court Property [sic] at an amount above market rates, which were between $20-$40 per person. Upon information and belief, AOSS hired another process service company to serve each person at market rates and simply marked up those invoices.

329. Upon information and belief, the McCabe Firm also contracted with its affiliate title vendor, REO, to bill for title searches relating to the foreclosure defendants.

330. Upon information and belief, REO charged approximately $450 for title work on the Columbia Street Property. This amount was well above market rates, which were between $100-$250.

331. Upon information and belief, the McCabe Firm submitted these invoices, with unreasonable and unnecessary foreclosure fees, to PNC.

332. Upon information and belief, PNC undertook no effort to review the invoices to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after January 2014, PNC overstated its reimbursement claim, seeking the whole amount from Freddie Mac.

333. Upon information and belief, Freddie Mac paid PNC's reimbursement claim for foreclosure fees including the unreasonable and therefore unallowable amounts.

**c. The O'Brien Avenue Property**

400. FHA insured a mortgage on a property on O'Brien Avenue in the Bronx, New York (the "O'Brien Avenue Property"). Flagstar serviced the O'Brien Avenue Property.

401. Flagstar engaged the McCabe Firm to handle foreclosure proceedings as to the O'Brien Avenue Property.

402. Upon information and belief, the McCabe Firm contracted with its affiliate service-of-process vendor, AOSS, to bill for service of process on the foreclosure defendants.

403. Upon information and belief, AOSS invoiced the McCabe Firm for service on defendants at the O'Brien Avenue Property at an amount above market rates, which were between $20-$40 per person. Upon information and belief, AOSS hired another process service company to serve each person at market rates and simply marked up those invoices.

404. Upon information and belief, the McCabe Firm submitted this invoice, with an unreasonable foreclosure fee, to Flagstar.

> 405. Upon information and belief, Flagstar undertook no effort to review the invoice to determine which amounts were reasonable and necessary and which amounts were not; rather, sometime after mid-2015, Flagstar overstated its reimbursement claim, seeking the whole amount from FHA.
>
> 406. Upon information and belief, FHA paid Flagstar's reimbursement claim for foreclosure fees including the unreasonable and therefore unallowable amounts.

See Exhibit "C".

66. The Complaint alleges that these examples, as well as those involving other lenders and law firms, "are only illustrative of a ***pattern and practice*** of impermissible overcharges of foreclosure expenses procured by law firms nationwide, as illustrated (but not limited to) the practices of the Rosicki, Baum, Aronowitz, McCabe, Medved, Fein Such, and Shapiro firms." See Exhibit "C", Complaint at ¶475 (emphasis added).

67. In putting himself forward as qualified to be the relator in this case, Grubea alleges that as part of his practice representing consumers in bankruptcy, he "discovered a pattern of foreclosure-related proofs-of-claims presenting unreasonable costs. Those claims included foreclosure fees beyond any reasonable sum, as well as fees for unnecessary work. Grubea found that, when he challenged servicers on these costs, they often reduced their bankruptcy claims. In addition, Grubea studied market rates for foreclosure fees, and found that servicers and their law firms were regularly claiming supra-market rates." See Exhibit "C", Complaint at ¶489.

68. Grubea alleges that he "also obtained direct and independent knowledge of these schemes through his communications with lawyers from large foreclosure law firms." Complaint at 490. However, he does not identify anyone at the McCabe Firm as revealing this information or admitting to such conduct. See Exhibit "C", Complaint at ¶491.

**THE RELATOR'S CAUSES OF ACTION**

69. The Complaint includes five counts under the FCA, only four of which are asserted against the McCabe Firm.

70. All of the Complaint's counts incorporate the Complaint's preceding allegations by reference. See Exhibit "C".

71. The FCA claims against MWC include causes of action under 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), 3729(a)(1)(C) and 3729(a)(1)(G).

72. Section 3729 of the FCA provides:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

....

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government....

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) Definitions. For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud….

See Exhibit "C".

73. The Complaint's First Claim is pleaded under section 31 U.S.C. § 3729(a)(1)(A). See Exhibit "C".

74. The Complaint asserts that "Defendants ***knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth***, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, ***false and fraudulent claims for payment*** in connection with claims for reimbursement by Fannie Mae, Freddie Mac, and FHA by: a. Submitting false annual certifications and making false representations to Fannie Mae, Freddie Mac, and/or FHA with respect to the Bank Defendants' qualifications for participation in Fannie Mae, Freddie Mac, and/or FHA servicing programs; and b. ***Submitting false or fraudulent claims*** to Fannie Mae, Freddie Mac, and/or FHA, for reimbursement of foreclosure costs." See Exhibit "C", Complaint at ¶496 (emphasis added).

75. The Complaint alleges that: "By reason of such ***false and/or fraudulent claims***, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation." See Exhibit "C", Complaint at ¶498 (emphasis added).

76. The Second Claim is pleaded under section 31 U.S.C. § 3729(a)(1)(B) against all Defendants. See Exhibit "C".

77. It alleges that the "Defendants ***knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records***

***and/or statements material to false or fraudulent claims*** to the Government and/or to contractors, grantees or other "recipients of Government funds used to advance Government interests, in connection with claims for reimbursement by Fannie Mae, Freddie Mac, and/or FHA." See Exhibit "C", Complaint at ¶500 (emphasis added).

78. It states that: "By reason of such ***false and/or fraudulent claims***, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation." See Exhibit "C", Complaint at ¶502 (emphasis added).

79. The Third Claim is pleaded under section 31 U.S.C. § 3729(a)(1)(C) against only the Law Firm Defendants. See Exhibit "C".

80. It alleges that: "The McCabe Defendants ***conspired***, between and among the McCabe Firm, AOSS, and REO to commit the violations set forth in the preceding claims." Complaint at 505 (emphasis added). It further alleges: "By reason of such ***false and/or fraudulent claims***, the Government has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation." See Exhibit "C", Complaint at ¶507 (emphasis added).

81. The Fifth Claim is pleaded against all Defendants under section 31 U.S.C. § 3729(a)(1)(G) for reverse false claims. See Exhibit "C".

82. It asserts that "by ***knowingly causing falsely inflated foreclosure expenses to be submitted to Fannie Mae and Freddie Mac for reimbursement***, Defendants made and used, or caused to be made or used, ***false records or statements material*** to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States for any quarter in which Fannie Mae or Freddie Mac was

obligated to pay Treasury a quarterly dividend following the Third Amendment to the Fannie Mae and Freddie Mac SPAs." See Exhibit "C", Complaint at ¶512 (emphasis added).

83. Further, "[b]ecause the Third Amendment to each SPA obligates Fannie Mae and Freddie Mac to make quarterly dividend payments of their net worth exceeding a capital reserve amount, and because any money that they used to pay servicing expenses necessarily resulted in a decrease to their net worth, the monies that Fannie Mae and Freddie Mac ***paid for reimbursement of false and inflated foreclosure expenses*** have decreased the amount of dividend payments to which the United States otherwise would have been entitled and received." See Exhibit "C", Complaint at ¶513 (emphasis added).

84. The Complaint seeks the following relief:

> 1. A judgment in the amount of the damage to the Government, trebled as required by law, with civil penalties as required by law, together with all such further relief as may be just and proper;
>
> 2. A judgment awarding Relator the maximum amount available under 31 U.S.C. § 3730(d) for bringing this action, namely twenty-five percent (25%) of the proceeds of any recovery on a claim by judgment or settlement to the extent that the Government has intervened in the claim (or pursues its claim through any alternative remedy available to the Government), or, alternatively, thirty percent (30%) of the proceeds of any recovery on a claim by judgment or settlement of the causes of action, to the extent that the Government has declined to intervene in the claim;
>
> 3. A judgment awarding Relator all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d); and
>
> 4. Awarding such other relief for the Government and Relator as this Court deems just and proper.

See Exhibit "C".

## THE POLICY

1. The Policy's "Coverage" section, states: "WE will pay, subject to OUR limit of liability, all DAMAGES the INSURED may be legally obligated to pay and CLAIM

EXPENSE(S), due to any CLAIM, provided that: … (3) the CLAIM results from the rendering or failure to render PROFESSIONAL SERVICES[.]" See Exhibit "A".

2. The Policy defines "INSURED" to include "(1) the NAMED INSURED; (2) any partner, member, shareholder or employee of the NAMED INSURED at the time the CLAIM is reported for PROFESSIONAL SERVICES rendered: (a) on behalf of the NAMED INSURED; or (b) prior to their relationship with the NAMED INSURED, subject to the PRIOR ACTS RETROACTIVE DATE, if any; (3) any former partner, member, shareholder or employee for former acts, errors or omissions in performing PROFESSIONAL SERVICES on behalf of the NAMED INSURED; (4) the heirs, assigns and legal representatives of an INSURED in the event of the INSURED's death, incapacity or bankruptcy to the extent that the INSURED would have been covered; and (5) any lawyer who is acting as of counsel and: (a) is named and described in the application as of counsel; and (b) is performing PROFESSIONAL SERVICES on behalf of the NAMED INSURED." See Exhibit "A".

3. The Policy's DEFINITIONS section states: "PROFESSIONAL SERVICES means legal or notary services provided for others, while engaged in the private practice of law or while acting as a PART TIME EMPLOYED ATTORNEY OF A GOVERNMENTAL BODY, SUBDIVISION OR AGENCY, including but not limited to: (1) services as an administrator, conservator or guardian, executor or personal representative, trustee; (2) escrow agent, title insurance agent; (3) mediator, arbitrator or other participant in a dispute resolution process; (4) activities as a member of a bar association, ethics, peer review, formal accreditation or licensing, or similar professional board or committee; and (5) activities as an author, strictly in the publication or presentation of research papers, articles in attorney trade publications or similar materials only

if the fees generated from such work are not greater than ten thousand dollars ($10,000)." See Exhibit "A".

4. The Policy's "DEFINITIONS" section further provides: "'DAMAGE(S) means monetary judgments or monetary settlements. DAMAGE(S) does not include any of the following: (1) any fine, penalty or sanction imposed by law or otherwise, or the multiplied portion of any damages assessed against any INSURED imposed directly or vicariously, whether or not imposed by statute or common law; (2) punitive or exemplary damages assessed against any INSURED, whether or not allowed by statute or common law; (3) any forfeiture, reduction, discount or return of professional fees earned or claimed by any INSURED; (4) the portion of any award, judgment or settlement that does not compensate for loss; 5) any order for restitution or other payment by a court, tribunal, or agency of government made in connection with the criminal conviction of an INSURED; or (6) the sanction of an INSURED to pay any fine, penalty or sum adjudged as restitution for damage or harm caused by an INSURED or as reimbursement to a court, tribunal or agency for its costs." See Exhibit "A".

5. Exclusion (1) to the Policy provides: "This policy does not afford coverage for the following: (1) any CLAIM for DAMAGES arising out of the dishonest, criminal, malicious or deliberately fraudulent act, error or omission of the INSURED, subject to the innocent Insured Protection provisions…." See Exhibit "A".

6. Exclusion (3) to the Policy provides that there is no coverage for "any CLAIM arising out of PROFESSIONAL SERVICES rendered by any INSURED in connection with any business enterprise: (a) owned in whole or in part; (b) controlled directly or indirectly; or (c) managed by any INSURED, where the claimed DAMAGES resulted from conflicts of interest

with the interest of any client or former client or with the interest of any person claiming an interest in the same or related business enterprise…." See Exhibit "A".

7. Exclusion (6) to the Policy provides that there is no coverage for "any CLAIM arising out of an INSURED'S activities as an officer or director of an employee trust, charitable organization, corporation, company or business other than that of the NAMED INSURED…." See Exhibit "A".

**COUNT I**
**DECLARATORY JUDGMENT THAT**
**ALL CLAIMS AGAINST MWC**
**ARE SUBJECT TO EXCLUSION(1)**
**AND THERE IS NO DUTY TO DEFEND OR INDEMNIFY**

8. MLM incorporates paragraphs 1 through 91 above as if fully set forth herein at length.

9. Exclusion (1) to the Policy provides: This policy does not afford coverage for the following: (1) any CLAIM for DAMAGES arising out of the dishonest, criminal, malicious or deliberately fraudulent act, error or omission of the INSURED, subject to the innocent Insured Protection provisions…." See Exhibit "A".

10. As set forth in detail above, the Complaint alleges that MWC, having knowledge of the GSEs' and FHA's rules and regulations, participated in a scheme aimed at "fleecing" those entities, and ultimately the United States government, by overcharging for vendor services, by creating affiliated vendors for the purpose of overcharging for these services, and/or by charging for legal services that MWC never rendered. See Exhibit "C".

11. There are no allegations of fact that would support a claim that the conduct at issue was innocent, negligent, careless or inadvertent, rather than being calculated, planned, intentional, illegal, dishonest and/or fraudulent in nature.

12. Moreover, the elements of each of the four FCA causes of action brought against MWC require more than negligence or careless conduct.

13. MLM seeks a declaration under 28 U.S.C. § 2201 that, under Policy Exclusion(1), there is no coverage for the claims in the *Qui Tam* Action against MWC, nor any duty to defend MWC against those claims under the Policy.

**WHEREFORE**, Plaintiff Minnesota Lawyers Mutual Insurance Company respectfully requests a declaration from this Honorable Court that it has no contractual obligation to provide insurance coverage and/or a defense to McCabe, Weisberg & Conway, LLC f/k/a McCabe Weisberg & Conway, P.C. in connection with the matter of United States of America ex Rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, et al., U.S. District Court for the Southern District of New York, CASE #: 1:12-cv-07199-JSR.

**COUNT II**
**DECLARATORY JUDGMENT THAT THERE IS NO DUTY TO DEFEND OR INDEMNIFY WHERE THE CLAIMS DO NOT INVOLVE "PROFESSIONAL SERVICES"**

14. Plaintiff incorporates paragraphs 1 through 97 above as if fully set forth herein at length.

15. Coverage is only due under the Policy where "the CLAIM results from the rendering or failure to render PROFESSIONAL SERVICES[.]" See Exhibit "A".

16. Per the Policy's definition section: "PROFESSIONAL SERVICES means legal or notary services provided for others, while engaged in the private practice of law ... including but not limited to: (1) services as an administrator, conservator or guardian, executor or personal representative, trustee; (2) escrow agent, title insurance agent; (3) mediator, arbitrator or other participant in a dispute resolution process; (4) activities as a member of a bar association, ethics, peer review, formal accreditation or licensing, or similar professional board or committee; and (5)

activities as an author, strictly in the publication or presentation of research papers, articles in attorney trade publications or similar materials only if the fees generated from such work are not greater than ten thousand dollars ($10,000)." See Exhibit "A".

17. As set forth in detail above, the *Qui Tam* Complaint alleges that MWC set up a scheme that would allow it and/or its affiliates to overcharge for vendor service and/or to charge for legal services not rendered. See Exhibit "C".

18. The *Qui Tam* Complaint seeks relief for this alleged overcharging for the costs associated with MWC's vendors' work, such as personal service and title searches; billing for services that were not actually provided by MWC; and/or creating AOSS and REO to generate profits and income that would not otherwise be attainable because of caps on legal fees MWC itself could charge. See Exhibit "C".

19. The use of billing and invoicing to overcharge is not a "PROFESSIONAL SERVICE" under the Policy. See Exhibit "A".

20. Including charges or overcharges in bills or invoices for vendor tasks such as service of process or title searches is not a "PROFESSIONAL SERVICE" under the Policy. See Exhibit "A".

21. Including charges or overcharges in bills or invoices for services that were not performed is not a "PROFESSIONAL SERVICE" under the Policy. See Exhibit "A".

22. Establishing and creating AOSS and REO to carry out certain functions and/or to generate impermissible overcharges is not a "PROFESSIONAL SERVICE" under the Policy. See Exhibit "A".

23. To the extent that the claims in the Underlying Action against MWC are based on conduct that did not include professional services, there is no duty to defend or indemnify MWC under the Policy.

24. Plaintiff thus seeks a declaration under 28 U.S.C. § 2201 that there is no duty to indemnify or defend MWC to the extent that the claims in the *Qui Tam* Action against MWC are based on conduct that did not include professional services.

**WHEREFORE**, Plaintiff Minnesota Lawyers Mutual Insurance Company respectfully requests a declaration from this Honorable Court that it has no contractual obligation to provide insurance coverage and/or a defense to McCabe, Weisberg & Conway, LLC f/k/a McCabe Weisberg & Conway, P.C. in connection with the matter of United States of America ex Rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, et al., U.S. District Court for the Southern District of New York, CASE #: 1:12-cv-07199-JSR.

**COUNT III**
**DECLARATORY JUDGMENT THAT THERE IS**
**NO DUTY TO DEFEND OR INDEMNIFY WHERE CLAIMS**
**DO NOT SEEK "DAMAGES" AS DEFINED IN THE POLICY**

25. Plaintiff incorporates paragraphs 1 through 108 above as if fully set forth herein at length.

26. The Policy provides, under "COVERAGE": "We will pay, subject to OUR limit of liability, all DAMAGES the insured may be legally obligated to pay and CLAIMS EXPENSE(S), due to any CLAIM …." See Exhibit "A".

27. In the "DEFINITIONS" section of the Policy "'DAMAGE(S) means monetary judgments or monetary settlements. DAMAGE(S) does not include any of the following: (1) any fine, penalty or sanction imposed by law or otherwise, or the multiplied portion of any damages assessed against any INSURED imposed directly or vicariously, whether or not imposed by statute

or common law; (2) punitive or exemplary damages assessed against any INSURED, whether or not allowed by statute or common law; (3) any forfeiture, reduction, discount or return of professional fees earned or claimed by any INSURED; (4) the portion of any award, judgment or settlement that does not compensate for loss; 5) any order for restitution or other payment by a court, tribunal, or agency of government made in connection with the criminal conviction of an INSURED; or (6) the sanction of an INSURED to pay any fine, penalty or sum adjudged as restitution for damage or harm caused by an INSURED or as reimbursement to a court, tribunal or agency for its costs." See Exhibit "A".

28. As such, DAMAGES does not include any fine, penalty or sanction imposed by law or otherwise, or the multiplied portion of any damages assessed. See Exhibit "A".

29. The Complaint seeks, among other things, fines, penalties, sanctions and treble damages. See Exhibit "C".

30. These claims do not constitute DAMAGES under the Policy and are not covered claims.

31. Moreover, the Complaint seeks as damages (which are to be trebled) the overpayment of vendor fees and/or legal fees MWC submitted to the GSEs or the FHA via the servicers. See Exhibit "C".

32. This is essentially a demand for a return of fees claimed by MWC.

33. Further, the Complaint seeks as damages statutorily permitted reasonable attorney's fees and costs, 31 U.S.C. § 3702(d)(2). See Exhibit "C".

34. This amounts to a penalty or sanction and/or does not compensate for loss.

35. Plaintiff seeks a declaration under 28 U.S.C. § 2201 that there is no duty to indemnify MCW for any claims seeking relief other than "DAMAGES" as defined in the Policy.

**WHEREFORE**, Plaintiff Minnesota Lawyers Mutual Insurance Company respectfully requests a declaration from this Honorable Court that it has no contractual obligation to provide insurance coverage and/or a defense to McCabe, Weisberg & Conway, LLC f/k/a McCabe Weisberg & Conway, P.C. in connection with the matter of United States of America ex Rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, et al., U.S. District Court for the Southern District of New York, CASE #: 1:12-cv-07199-JSR, to the extent that the Underlying Action is seeking relief other than "DAMAGES" as defined in the Policy.

**COUNT IV**
**DECLARATORY JUDGMENT THAT**
**ALL CLAIMS AGAINST MWCARE SUBJECT TO EXCLUSION(3)**
**AND THERE IS NO DUTY TO DEFEND OR INDEMNIFY**

36. MLM incorporates paragraphs 1 through 119 above as if fully set forth herein at length.

37. Exclusion (3) to the Policy provides that there is no coverage for "any CLAIM arising out of PROFESSIONAL SERVICES rendered by any INSURED in connection with any business enterprise: (a) owned in whole or in part; (b) controlled directly or indirectly; or (c) managed by any INSURED, where the claimed DAMAGES resulted from conflicts of interest with the interest of any client or former client or with the interest of any person claiming an interest in the same or related business enterprise…." See Exhibit "A".

38. The Complaint alleges that "This action seeks to recover damages and penalties on behalf of the Government for the illegal and excessive claims made by the Bank Defendants for reimbursement from [the GSEs] and FHA. This suit also seeks to recover damages and penalties from the Law Firm Defendants for causing banks to make claims for excessive reimbursements." See Exhibit "C", Complaint at ¶3.

39. The Complaint alleges that the "McCabe Firm and/or its principals or agents have an interest in and control over AOSS and REO." See Exhibit "C", Complaint at ¶139.

40. Further, the Complaint alleges that: "The McCabe Firm has contracted with AOSS and REO for the McCabe Firm's title and service work for foreclosure proceedings" and that "[u]pon information and belief, AOSS and REO has systematically billed the clients of the McCabe Firm—and, ultimately, Fannie, Freddie, and FHA—at excessive rates for services including: a. Title searches well above market rates (*e.g.*, at more than $450, despite market rates between $100-$250); and b. Personal service well above market rates (*e.g.*, at more than $200, despite market rates of approximately $20-$40)." See Exhibit "C", Complaint at ¶¶140-141.

41. The Complaint further alleges that: "Upon information and belief, the McCabe Firm contracts for services at excessive rates from AOSS and REO for the primary purpose of generating fees for AOSS and REO." See Exhibit "C", Complaint at ¶142.

42. The Complaint alleges that "The McCabe Firm also contracts for these services to avoid performing the work that it is required to perform under the applicable GSE contracts and FHA rules in order to earn the legal fees that it charges to the Bank Defendants." See Exhibit "C", Complaint at ¶143.

43. The Complaint alleges that ". . . by offloading the tasks required of the McCabe Firm onto its affiliates, the McCabe Firm generates profits in two ways: (1) by generating fees for its affiliates; and (2) by avoiding labor and other overhead expenses that are supposed to be included in the McCabe Firm's legal fees." See Exhibit "C", Complaint at ¶143.

44. The Complaint alleges that "These services are not reimbursable by the GSEs or FHA." See Exhibit "C", Complaint at ¶144.

45. Further, the Complaint alleges that "AOSS does not provide many of these services itself. Instead, with the assent of MCW, AOSS often contracts with other entities to conduct services,

such as service of process, and then simply marks up the bill before seeking reimbursement." See Exhibit "C", Complaint at ¶145.

46. The Complaint alleges that "Although the McCabe Firm could readily contract directly with entities serving process, it chooses to contract with AOSS instead, in order to generate profits from allowing AOSS to mark up the services bills of other entities." See Exhibit "C", Complaint at ¶145.

47. The Complaint alleges that "Upon information and belief, the McCabe Defendants billed the Bank Defendants for these unnecessary and excessive charges with the intention, expectation, knowledge, and belief that the Bank Defendants would seek reimbursement from the Government for these charges." See Exhibit "C", Complaint at ¶146.

48. Such claims are not covered under Policy Exclusion (3) and MLM does not have an obligation to investigate, negotiate, defend and/or indemnify MCW.

49. Plaintiff thus seeks a declaration under 28 U.S.C. § 2201 that there is no duty to indemnify or defend MCW to the extent that the claims in the *Qui Tam* Action against MCW are the result of conflicts of interest with the banks and/or the GSEs.

**WHEREFORE**, Plaintiff Minnesota Lawyers Mutual Insurance Company respectfully requests a declaration from this Honorable Court that it has no contractual obligation to provide insurance coverage and/or a defense to McCabe, Weisberg & Conway, LLC f/k/a McCabe Weisberg & Conway, P.C. in connection with the matter of United States of America ex Rel. Peter D. Grubea v. Rosicki, Rosicki & Associates, et al., U.S. District Court for the Southern District of New York, CASE #: 1:12-cv-07199-JSR.

**COUNT V**
**DECLARATORY JUDGMENT THAT**
**ALL CLAIMS AGAINST MCW**
**ARE SUBJECT TO EXCLUSION(6)**
**AND THERE IS NO DUTY TO DEFEND OR INDEMNIFY**

50. MLM incorporates paragraphs 1 through 133 above as if fully set forth herein at length.

51. Exclusion (6) to the Policy provides that there is no coverage for "any CLAIM arising out of an INSURED'S activities as an officer or director of an employee trust, charitable organization, corporation, company or business other than that of the NAMED INSURED…." See Exhibit "A".

52. The Policy defines "INSURED" to include, among others, "any partner, member, shareholder or employee of the NAMED INSURED at the time the CLAIM is reported for PROFESSIONAL SERVICES rendered[, and …] any former partner, member, shareholder or employee for former acts, errors or omissions in performing PROFESSIONAL SERVICES on behalf of the NAMED INSURED…." See Exhibit "A".

53. The Complaint alleges that MCW partner Terrence McCabe is the Chairman or Chief Executive Office of AOSS. See Exhibit "C", Complaint at ¶139.

54. Claims against MCW arising out of Terrence McCabe's activities with AOSS are not covered under Exclusion (6).

55. Plaintiff thus seeks a declaration under 28 U.S.C. § 2201 that there is no duty to indemnify or defend MCW to the extent that the claims in the *Qui Tam* Action against MCW are the result of Terrence McCabe's activities with AOSS.

**WHEREFORE**, Plaintiff Minnesota Lawyers Mutual Insurance Company respectfully requests a declaration from this Honorable Court that it has no contractual obligation to provide insurance coverage and/or a defense to McCabe, Weisberg & Conway, LLC f/k/a McCabe Weisberg & Conway, P.C. in connection with the matter of United States of America ex Rel. Peter

D. Grubea v. Rosicki, Rosicki & Associates, et al., U.S. District Court for the Southern District of New York, CASE #: 1:12-cv-07199-JSR.

Respectfully submitted,

FINEMAN, KREKSTEIN & HARRIS, P.C.

By:______________________________

RICHARD J. PERR, ESQUIRE
PA ID No. 72883
HEMA PATEL MEHTA, ESQUIRE
PA ID No. 90148
LAURA SEIDER, ESQUIRE
PA ID No. 308972
1801 Market Street – Suite 1100
Philadelphia, PA 19103
Telephone: 215-893-9300
Fax: 215-893-8719
Emails: rperr@finemanlawfirm.com
hmehta@finemanlawfirm.com
lseider@finemanlawfirm.com
Attorneys for Plaintiff
Minnesota Lawyers Mutual Insurance Company

Dated: June 1, 2018